IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 03-cv-02579-RPM

NATIONAL OILWELL VARCO, L.P.

      Plaintiff,

v.

PASON SYSTEMS USA CORP.

      Defendant.

---

## ORDER ON POST VERDICT MOTIONS

---

At the close of the evidence, Pason Systems USA Corporation ("Pason") moved for judgment as a matter of law under Fed.R.Civ.P. 50(a), arguing the insufficiency of the evidence to support findings of infringement of claim 1, 11 and 14 of U.S. Patent No. 5,474,142 ("the '142 Patent"). The Defendant has renewed and amplified those arguments in seeking to set aside the jury's verdict by its motion under Rule 50(b). Recognizing that the court may not weigh the conflicting evidence or judge the credibility of witnesses in a manner that would undermine the factual findings implicit in the jury's verdict, the arguments are not persuasive. *Johnson v. Unified Gov't of Wyandotte County/Kan. City, Kan.,* 371 F.3d 723, 728 (10th Cir. 2004).

Pason also moved for a judgment on its claims of invalidity of the claims in suit, contending that the Brett/Warren publication anticipated claims 1 and 11 and that claims 1, 11 and 14 are obvious in light of combinations of prior art in evidence. Pason emphasizes the testimony of Ford Brett and Tommy Warren was not contradicted by any of the Plaintiff's

witnesses. National Oilwell Varco L.P. ("Varco") contends that the court may not consider these arguments because they were not included in the oral motion under Rule 50(a). That contention is rejected because the Defendant's counsel complied with the court's request to limit the argument to avoid delay in submitting the case to the jury. *See, e.g., Motorola, Inc. v. Interdigital Tech. Corp.*, 930 F.Supp. 952, 962 (D. Del. 1996), *aff'd in part, rev'd in part on other grounds*, 121 F.3d 1461 (Fed. Cir. 1997).

These arguments must also be considered in determining whether the jury's determination of willfulness should stand, and, if so, whether to enhance the damages. *In re Seagate Tech., LLC*, 497 F.3d 1360 (Fed. Cir. 2007); *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826 (Fed. Cir. 1992).

As discussed below, the claims of invalidity present a close question, particularly because of the testimony of the Defendant's witnesses Brett and Warren. The jury was not persuaded by that testimony and it is exclusively the province of the jury to assess the credibility of all witnesses. They have the authority to reject the testimony of a witness in its entirety and this court may not review or revisit that determination. Accordingly, the Defendant's motion to set aside the verdict on invalidity is denied.

Reviewing the evidence under the different standard applicable to the exercise of discretion with respect to enhanced damages on a jury finding of willfulness is a different matter.

"An award of enhanced damages for infringement, as well as the extent of the enhancement, is committed to the discretion of the trial court." *Read*, 970 F.2d at 826; *Modine Mfg. Co. v. Allen Group, Inc.*, 917 F.2d 538, 543 (Fed. Cir. 1990). Factors relevant to the determination of whether damages should be enhanced are: (1) whether the infringer

deliberately copied the ideas or design of another; (2) whether the infringer, when it knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the defendant's size and financial condition; (5) the closeness of the case; (6) the duration of the defendant's misconduct; (7) remedial action by the defendant; (8) the defendant's motivation for harm, and (9) whether the defendant attempted to conceal its misconduct. *Read*, 970 F.2d at 826-27. The question of whether the infringer advanced legitimate defenses to infringement or credible invalidity arguments is of paramount significance to the determination of whether an award of enhanced damages is appropriate. *See Seagate*, 497 F.3d at 1374.

The '142 Patent relates to "an automatic drilling system that controls the release of a drill string in vertical, directional and horizontal drilling operations in response to any one of or any combination of bit weight, drilling fluid pressure, drill string torque and drill string RPM." '142 Patent, col. 1, ll. 7-11 (Ex. 1).[1] Automatic drilling systems were known in the drilling industry when the inventor, Bobbie J. Bowden, conceived the claimed invention(s). At that time, most drilling rigs were equipped with automatic drilling systems that relied on measurements of the weight of the suspended drill string, known weight on bit ("WOB") or hookload, to control the release of the drill string.[2] Measurements of WOB are useful for regulating the release of the

---

[1] Unless otherwise indicated, exhibit references ("Ex.") refer to trial exhibits. The Plaintiff's exhibits are designated by number, and the Defendant's exhibits are designated by letter and number.

[2] Figure 1 of the '142 Patent illustrates a typical drilling rig having a derrick with a drill string suspended from a cable operated drawworks.

drill string during the drilling of a vertical borehole, but WOB is an unreliable indicator when the borehole deviates from a vertical direction. *See* '142 Patent, col. 1, ll. 14-55.

Drilling operators often reverted to manual control of the braking system to control the release of the drill sting during directional or horizontal drilling, due to the unreliability of WOB measurements under those conditions. At the time of Bowden's invention, it was known in the industry that measurements of drilling fluid pressure were useful in assessing the progress of drilling operations, particularly when power was provided by a mud motor. Mud motors (also known as positive displacement motors) are powered by pressurized drilling fluid (mud), delivered to the drill string by a mud pump. Mud motors provide a source of downhole power for advancing the drill string and bit in a borehole. The drilling of horizontal and directional boreholes coincided with the development and commercial use of mud motors.

Bowden sought to create an automatic drilling system that provided better control than the WOB systems that were then being used in the industry. Bowden was familiar with automatic drilling systems from his many years of working on drilling rigs and from working with his father, who had developed and patented an automatic drilling system known as the Satellite driller. In January 1992, Bowden created and tested an automatic drilling system that could use measurements of WOB, drilling fluid pressure, drill string torque and drill string RPM, either alone or in combination, to regulate the release of the drill string. The prototype system that Bowden created expanded upon the Satellite system, which featured pneumatic components for regulating the drill string's release.

The application for the '142 Patent was filed on April 19, 1993, and the Patent issued on December 12, 1995.

Bowden began producing an automatic drilling system of the type illustrated and described as the preferred embodiment in the '142 Patent, naming his device the Wildcat Driller. The Wildcat Driller was distributed initially by Baker Hughes, Inc. and later by Wildcat Services, L.P, pursuant to licenses with Bowden. In October 2001, Wildcat Services, L.P. acquired the '142 Patent from Bowden.

In early 2000, Pason Systems, Inc., a Canadian company, began work on the development of a computerized multi-parameter automatic drilling system. Those efforts led to the development of the Pason AutoDriller. In August 2003, Pason Systems USA Corporation began importing Pason AutoDrillers into the United States for sale and rental. In December 2003, Wildcat Services brought this suit against Pason, alleging that the AutoDriller infringes the '142 Patent. In June 2004, Varco, L.P. purchased the assets of Wildcat Services (including the '142 Patent) and was substituted as the Plaintiff.[3]

The claims in suit, claims 1, 11, and 14, are all independent claims. Claim 1 reads:

1. An automatic drilling system for automatically regulating the release of the drill string of a drilling rig during the drilling of a borehole, comprising:

    a drilling fluid pressure sensor;

    a drilling fluid pressure regulator coupled to said drilling fluid pressure sensor, said drilling fluid pressure regulator measuring changes in drilling fluid pressure and outputting a signal representing those changes;

    a relay coupled to said drilling fluid pressure regulator, said relay responsive to the output signal of said drilling fluid pressure regulator to supply a drill string control signal at an output thereof; and

---

[3]In 2007, Varco changed its name to National Oilwell Varco, L.P. For ease of reference, the parties and the court have continued to refer to the Plaintiff as Varco.

>>a drill string controller coupled to said relay wherein a decrease in drilling fluid pressure results in said relay supplying a drill string control signal that operates said drill string controller to effect an increase in the rate of release of said drill string and an increase in drilling fluid pressure results in said relay supplying a drill string control signal that operates said drill string controller to effect a decrease in the rate of release of the drill string.

'142 Patent, col. 24, ll. 37-58.

>Claim 11 reads:

>11.   A method for automatically regulating the release of the drill string of a drilling rig drill, comprising the steps of:

>>measuring drilling fluid pressure;

>>producing a signal in response to changes in drilling fluid pressure, said signal representing the changes in drilling fluid pressure;

>>relaying said signal to a drill string controller; and

>>controlling said drill string controller to increase the rate of release of said drill string when said signal represents a decrease in drilling fluid pressure and to decrease the rate of release of said drill string when said signal represents an increase in drilling fluid pressure.

'142 Patent, col. 27, ll. 44-56.

>Claim 14 reads:

>14.  A method for automatically regulating the release of the drill string of a drilling rig drill, comprising the steps of:

>>measuring drilling fluid pressure and bit weight;

>>producing a first signal in response to changes in drilling fluid pressure; said first signal representing the changes in drilling fluid pressure;

>>producing a second signal in response to changes in bit weight, said second signal representing changes in bit weight;

>>selecting any one of said first signal, said second signal, and both said first and said second signals to control the release of the drill string; and

>> relaying said selected signal or signals to a drill string controller which
>> regulates the release of said drill string in response to said selected signal
>> or signals.

'142 Patent, col. 28, ll. 23-38.

At trial, Pason contended that claims 1 and 11 are anticipated by an article written by Brett and Warren, captioned "Field Experiences with Computer Controlled Drilling," published in 1990 by the Society of Petroleum Engineers (the "Brett/Warren publication," Ex. B-24). "To anticipate a claim, a prior art reference must disclose every limitation of the claimed invention, either explicitly or inherently." *In re Schreiber*, 128 F.3d 1473, 1477 (Fed. Cir. 1997).

Pason also contended that Claims 1, 11 and 14 are obvious in light of the following prior art references:

> U.S. Patent No. 1,891,329 to LeCompte (issued Dec. 20, 1932)("LeCompte"), Ex. C-20;
>
> U.S. Patent No. 2,005,889 to Dillon (issued June 25, 1935) ("Dillon"), Ex. C-19;
>
> U.S. Patent No. 3,223,183 to Varney (issued Dec. 14, 1965) ("Varney"), Ex. C-11;
>
> the F.S. Young article, "Computerized Drilling Control," published in the Journal of Petroleum Technology (April 1969) ("Young"), Ex. B-20;
>
> U.S. Patent No. 3,550,697 to Hobhouse (issued Dec. 29, 1970) ("Hobhouse"), Ex. C-18;
>
> Canadian Patent No. 876,580 to Miller/Garrett (issued July 27, 1971) ("Miller/Garrett"), Ex. C-17;
>
> U.S. Patent No. 4,662,608 to Ball (issued May 5, 1987) ("Ball"), Ex. C-16, and
>
> the Brett/Warren publication, Ex. B-24.

Section 103 of Title 35 of the United States Code provides in pertinent part:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

The determination of obviousness is a legal question, underpinned by "factual questions relating to the scope and content of the prior art, the differences between the prior art and the claimed invention, the level of ordinary skill in the art, and any relevant secondary considerations, such as commercial success, long-felt need, and the failure of others." *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1359 (Fed. Cir. 2007); *see Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966).

The relevant arts are oil and gas drilling and control technology. The parties agreed that a person of ordinary skill is a person possessing certain specialized skills, who has competent technical training and familiarity in the onshore and offshore oil and gas exploration industry, including some relevant experience with electro-mechanical control systems.[4]

An examiner's opinion on reexamination, issued in August 2005, identified the difference between certain prior art and the claimed invention. On January 26, 2004, shortly after the Plaintiff brought this action, Pason requested an ex parte reexamination of claims 1 and 11 of the '142 Patent, asserting that those claims are unpatentable over Varney, a patent that had not been considered during prosecution of the '142 Patent. On April 15, 2004, the PTO granted Pason's request for reexamination, agreeing that Varney raised a substantial new question of patentability as to claims 1 and 11 because the use of drilling fluid pressure to control the release of the drill string had not been present in the examination of the original patent.

---

[4] Tr. 1714:6-11, Nov. 5, 2008. Transcript references ("Tr.") refer to the trial transcript.

On August 31, 2005, the PTO issued its reexamination opinion, confirming the patentability of the '142 Patent claims. The examiner stated:

> [T]he prior art of record, including Varney, US Patent 3,223,183, fail to show or suggest an automatic drilling system having drill string wherein a decrease in drilling fluid pressure results in a relay supplying a drill string control signal that operates a drill string controller to effect an "increase in the rate of release" of said drill string and an increase in drilling fluid pressure results in said relay supplying a drill string control signal that operates said drill string controller to effect a "decrease in the rate of release" of said drill string. While Varney shows drill string control based upon drilling fluid pressure that relaxes and tightens the drill string. [sic] Varney does not teach or suggest effecting an "increase in the rate of release" and a "decrease in the rate of release" as it pertains to independent claims 1, 9, and 11.  Claims 2-8, 10 and 12-15 are patentable due to their dependency on claims 1, 9, and 11.

Ex. A-3 at p. NOV 794.[5]

In short, Bowden was not the first to invent an automatic drilling system that employed a signal representing drilling fluid pressure to control the release of the drill string. Varney did that, but Varney discloses the production of a pressure signal in relation to a target value, causing the drill string to advance or stop in an on/off fashion. In contrast, the '142 Patent teaches the production of a control signal that varies in response to successive changes in a designated control parameter or combination of parameters, providing control over the drill string's rate of release. Thus, the novelty of Claim 1 (an apparatus claim) and claim 11 (a method claim) is the use of drilling fluid pressure measurements to automatically control the *rate of release* of the drill string. The novelty of Claim 14 is the use of drilling fluid pressure

---

[5]The examiner's characterization of claim 14 as a dependent claim was an error. The term "rate of release" does not appear in the language of claim 14. The court construed the term "release of the drill string" in claim 14 to mean "rate of release of the drill sting."

measurements in combination with WOB measurements to control the *rate of the release* of the drill string.

Brett testified that the Young article and Ball patent disclose the concept of automatically controlling the drill string's rate of release. Tr. 1338:2 – 1339:3; 1342:1-13, Nov. 4, 2008. Brett acknowledged that the systems described by Young and Ball do not use drilling fluid pressure as a control parameter, but stated that Young provided an explicit suggestion to use drilling fluid pressure to regulate the rate of release of the drill string in the same manner as WOB, pointing to the following statement in Young: "Experience has shown the benefit of improved supervisory control. Logical extensions of the program then are to hydraulics, drilling fluid pressure, and pressure sensing and control." *Id.* 1335:10 – 1336:14; Ex. B-20. Brett testified that for someone of ordinary skill in the art the idea of connecting a drilling fluid pressure sensor to the type of system used by Ball would have been predictable, and that attaching a drilling fluid pressure sensor to the type of regulator and relays used within the known pneumatic systems, such as the Satellite system, yielded a predictable result. Tr. 1375:16 – 1376:6, Nov. 4, 2008.

Brett testified that in the late 1980s, he and Warren recognized that drilling fluid pressure could be used to achieve control in the same manner as WOB. Warren and Brett testified that while working for Amoco, they developed a computer controlled automatic drilling system as part of a research project. Warren and Brett reported about their work in a written publication,"Field Experiences with Computer Controlled Drilling," which described "the mechanical, electrical, computer and software systems of a prototype computer controlled drilling rig." In March 1990, Brett made a presentation about this work at a conference sponsored by the Society of Petroleum Engineers.

Brett and Warren conducted their work in an experimental setting using a full scale rig that was designed for testing drilling equipment. Tr. 1221:5 – 1222:19, Nov. 3, 2008. The hoisting system of the test rig was a hydraulic snubbing unit that pushed or pulled the drill pipe (drill string) in or out of the borehole. *Id.* 1222:20 – 19. The drill string's advance was controlled by an electronic servo controller. Warren stated that a servo controller is device that allows a user to set a parameter to be kept constant, explaining that a servo controller produces a command signal based on the control parameter. *Id.* 1227:10-21. The automated control system developed by Warren and Brett contained various sensors, including sensors for measuring WOB, drilling fluid pressure, and torque. *Id.* 1227:3-6. Warren stated that the system could be set to control based on drilling fluid pressure, and if so, the servo controller could measure changes in drilling fluid and output a command signal representative of those changes. Warren testified that under that setting, the control system would cause the hydraulic motor to either push or pull the drill string depending on whether drilling fluid pressure decreased or increased. *Id.* 1232:19 – 1233:17. Warren stated that the output signal of the servo controller was continuous and proportionate. *Id.* 1233:15-17. Warren stated that if the system were set to control based on drilling fluid pressure and pressure increased a lot, the control system would cause a corresponding decrease in the rate of advancement of the drill string. *Id.* 1233:6-14. Similarly, if pressure decreased, the system would cause a corresponding increase in the rate of the drill string's advancement. *Id.*

At trial, the Plaintiff emphasized that the drilling rig used in the Brett/Warren experiments was not a traditional rig, pointing out that it lacked drawworks and a conventional brake. This distinction is irrelevant because none of the asserted claims require use of a

-11-

traditional rig having drawworks or a particular type of braking system.  Notably, the specification of the '142 Patent describes and illustrates an alternative embodiment in which the claimed system is configured to operate with a coil tubing rig powered by hydraulic motors. '142 Patent, Fig. 14 & col. 21, l. 56 – col. 27.  The fact that the rig described in the Brett/Warren publication was not a conventional drawworks rig is not a feature that distinguishes the disclosures of the Brett/Warren publication from the claims in suit.

The Plaintiff also emphasized that the Brett/Warren publication was not concerned with solving the problems of automatically controlling the drilling of directional and horizontal boreholes.  This argument is also inapplicable to anticipation analysis.  Anticipation does not require that the prior reference be concerned with exactly the same problem as the subject patent. *See Kalman v. Kimberly-Clark Corp.*, 713 F.2d 760, 772 (Fed. Cir. 1983)("The law of anticipation does not require that the reference 'teach' what the subject matter of the patent teaches . . . [I]t is only necessary that the claims under attack, as construed by the court, 'read on' something disclosed in the reference. i.e., all limitations of the claim are found in the reference, or 'fully met' by it."), *overruled in part on other grounds, SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1125 (Fed. Cir. 1985) (en banc)).  Even when the challenge to validity is based on obviousness, relevant teachings are not necessarily limited to those references that address only the same problem as the challenged patent.  *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420-21, 127 S.Ct. 1727, 1742  (2007).

The Plaintiff also characterized the Brett/Warren publication as "teaching away" from the novel features of the '142 Patent claims.  Teaching away is inapplicable to anticipation analysis. *See Celeritas Techs., Ltd. v. Rockwell Int'l*, 150 F.3d 1354, 1360 (Fed. Cir. 1998) ("A reference

is no less anticipatory if, after disclosing the invention, the reference then disparages it.") Furthermore, the statements from the Brett/Warren publication that the Plaintiff characterize as "teaching away" refer to the economic difficulties of implementing a computer-controlled automated drilling system. The authors' comments about the feasibility of computer control don't disparage the concept of using drilling fluid pressure to control the drill string's rate of release.

At trial, the Plaintiff argued that the Brett/Warren publication does not disclose controlling the *rate of release* of the drill string, emphasizing that the publication does not explicitly use the words increase or decrease the "rate of release." Brett acknowledged this fact on cross-examination. Tr. 1413:17-20; 1422:2-5, Nov. 4, 2008.

"[T]he rule that anticipation requires that every element of the claims appear in a single reference accommodates situations where the common knowledge of technologists is not recorded in the reference." *Cont'l Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268-69 (Fed. Cir. 1991). When a claim limitation is not explicitly set forth in the reference, the party challenging validity must present evidence showing "that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill." *Id.*

Warren's testimony, explaining that the system described in the Brett/Warren publication provided proportionate control over the drill string's release, related to the inherent disclosures of the publication. Under cross examination by Plaintiff's counsel, Warren would not agree that the system operated in an on/off fashion, and stated that a servo valve could be partially open or partially closed. Tr. 1252:16 – 1253:12; 1256:14 – 1257:17, Nov. 3, 2008. The scope of the

prior art is a factual issue, and the conclusions to be drawn from Warren's testimony were matters for the jury to determine. Yet for the purpose of determining whether damages should be enhanced, the court recognizes that Pason advanced credible arguments that claims 1 and 11 are invalid on the basis of anticipation or obviousness, and the question was close.

With respect to the obviousness of Claim 14, Brett testified (and the Plaintiff does not dispute) that Dillon, Young, and Hobhouse each teach multi-parameter control. Dillon describes an automatic system that uses both measurements of WOB and drilling fluid pressure to provide control of the release of the drill string. Hobhouse also describes a multi-parameter system that uses both WOB and pressure. The difference between those systems and Bowden's invention is that Dillon and Hobhouse use pressure as a control in an on/off fashion, rather than to achieve proportionate control, that is, control in which release of the drill string accelerates or decelerates in relation to changes in the control parameter(s). Young discloses a system that achieves proportionate control, using WOB and other parameters, such as torque (but not pressure). As set forth above, Brett testified that Young provided an explicit suggestion to combine the use of WOB measurements with measurements of drilling fluid pressure to achieve proportionate control. Tr. 1335:10 – 1336:14, Nov. 5, 2008.

At trial, the Plaintiff argued that the results of the original examination and the reexamination proceeding demonstrated that the claims of the '142 Patent are not obvious. The Plaintiff also presented evidence of secondary considerations, including long felt need, commercial success, and licensing. The jury instructions stated the correct legal standards, and the evidence, especially with respect to secondary considerations, was sufficient to support the jury's verdict of non-obviousness. A contrary finding would not be unreasonable. Pason

showed that the elements of claims 1, 11 and 14 represent a combination of features that were known in the art at the time of invention. Brett's testimony provided evidence that a person skilled in the arts of drilling and control technology, at the time of Bowden's invention, would have recognized that these prior art elements could be combined to achieve a predictable result. The reexamination opinion does not indicate that the examiner considered whether Varney, in combination with other art such as Ball, would render the '142 Patent claims obvious. After *KSR*, the requirement of a "teaching, suggestion or motivation to combine" is more flexible than the standard that prevailed during the original examination and reexamination. Pason provided evidence of such a teaching or suggestion. In sum, Pason advanced a substantial challenge to the validity of the claims in suit.

Other factors weigh against an award of enhanced damages. There is no evidence that Pason intentionally copied the system and methods of the '142 Patent when it designed the AutoDriller's computerized control system and algorithm. Pason began work on the AutoDriller in early 2000. At that time, the Wildcat Driller employed a pneumatic control system. Trevor Holt, the Pason employee who designed the AutoDriller, testified that he had never seen a Wildcat system, and that neither he nor anyone else at Pason ever took one apart to see how it works. Tr. 871:2-16. Holt testified that he reviewed the '142 Patent, but did not see anything there that would form a good starting point for his design work. Tr. 872:20-23. Holt testified that he did not refer to the '142 Patent while building the AutoDriller. Tr. 872:24 – 873:1.

The court record does not reflect improper or bad faith litigation conduct on the part of Pason. Pason's initiation of the reexamination proceeding was not egregious. The reexamination proceeding did not delay the court proceedings, and in fact helped to focus the

issues for trial by clarifying the distinctions between prior art and the claimed invention. The fact that Pason's positions on claim construction evolved during the course of the litigation is not a factor that weighs in favor of enhanced damages. A party is entitled to clarify its claims and defenses and the evidence supporting them as litigation unfolds. The Plaintiff was not subjected to any surprise or unfairness at trial.[6]

There is no merit to the Plaintiffs' argument that Pason's disjointed production of the complete AutoDriller computer code shows that the Pason was attempting to conceal the AutoDriller's components or method of operation. Pason has explained the circumstances surrounding its production of the code, and the Plaintiff was not prejudiced by the conduct of which it complains. After reviewing the code, the Plaintiff's counsel apparently decided that the computer code was not helpful to Varco's claim of infringement. The Plaintiff's technical expert, Gregg Perkin, testified that he did not review the code.

The Plaintiff also accuses Pason of another untimely document production, characterizing that production as a "document dump." This discovery matter, which did not require the court's involvement, is not a factor.

The opinion letters authored by Pason's counsel Terry Leier in 2000 and 2002 show that Pason was aware of the '142 Patent and investigated its scope. Based on those letters, Pason

---

[6]The Plaintiff's claim constructions also evolved during the litigation. For example, in the Plaintiff's brief in support of its motion for preliminary injunction, the Plaintiff proposed that the phrase "producing a signal in response to changes in drilling fluid pressure, said signal representing the changes in drilling fluid pressure" means "producing a signal in response to changes in the force per unit area of the drilling fluid/mud, said signal representing the changes in the force per unit area of drilling fluid/mud." [Doc. 3 at pp. 18 & 22]. In subsequent briefs and at trial, the Plaintiff argued that "said signal"is not limited to a signal that represents only changes in drilling fluid pressure, but may also encompass other information, such as drum rotation. *See* Doc. 228.

formed a belief that the '142 Patent was invalid. The examiner's opinion on reexamination rejected Leier's view that Varney rendered the '142 Patent was invalid, but even so, Pason's continued defense of this action does not indicate bad faith. The examiner's conclusions did not address all of the prior art at issue in the case. Furthermore, Pason had credible defenses to infringement based on its proposed claim construction, and several claim construction disputes were not resolved until trial.

The Plaintiff argues that Pason's financial results show that it could easily absorb an award of $45 million. The evidence submitted by the Plaintiff is insufficient to support that conclusion.

To the extent that other factors, such as the Defendant's profit motivation, the duration of the infringement, or the lack of remedial action, might weigh in favor of enhanced damages, those factors are outweighed by the closeness of the case and the lack of evidence of copying.

*The Defendant's Rule 59(a) motion*

As an alternative to its Rule 50 motion, the Defendant moved for a new trial, arguing (1) the jury should not have been instructed on the doctrine of equivalents; (2) the court should not have instructed the jury about the significance of the word "comprising" in patent claims; (3) the Plaintiff's counsel's closing argument misled the jury about the significance of the initial examination and reexamination because the standard for obviousness has evolved in light of *KSR*; (4) the court should have allowed Pason to present evidence that the Plaintiff's motion for preliminary injunction did not succeed, or alternatively, the court should have dismissed or bifurcated the Plaintiff's claim of willful infringement, and (5) the jury should have been given limiting instructions regarding the presumptions of validity and enhanced validity.

"Generally, courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or substantial justice has not been done." *Anthony v. Baker,* 808 F.Supp. 1523, 1525 (D. Colo. 1992). A new trial is appropriate where the jury verdict is against the weight of the evidence, the damages are excessive or the trial was not fair to the moving party. . . . However, this does not mean that a judge can substitute his judgment for that of the jury. It must be clear that an erroneous result was reached, . . . and that the verdict was clearly or overwhelmingly against the weight of the evidence." *Jackson v. City of Albuquerque*, 890 F.2d 225, 231 (10th Cir. 1989) (internal and ending citations omitted).

Pason has the burden of demonstrating that a new trial is appropriate. *See Prebble v. Brodrick*, 535 F.2d 605, 617 (10th Cir. 1976). Pason has not carried its burden.

Based on the foregoing it is

ORDERED that the Defendant's renewed motion pursuant to Rule 50(b) for judgment as a matter of law [Doc. 238] is denied; and it is

FURTHER ORDERED that the Defendant's alternative Rule 59(a) motion for new trial [Doc. 238] is denied; and it is

FURTHER ORDERED that the Plaintiff's motion for enhanced damages [Doc. 240] is denied..

Dated:   April 30, 2009

BY THE COURT:

s/Richard P. Matsch
_____
Richard P. Matsch, Senior District Judge